UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, ex rel. ANDY BESHEAR, Attorney General of Kentucky, and<br><br>JEFFERSON COUNTY TEACHERS ASSOCIATION,<br><br>    Plaintiffs,<br><br>V.<br><br>DAVID DICKERSON, in his official capacity as Secretary of the Kentucky Labor Cabinet,<br><br>    Defendant. | Civil Action No. 3: 19-033-DCR<br><br>**MEMORANDUM OPINION AND ORDER** |

*** *** *** ***

In 2018 and 2019, a number of public school teachers protested certain proposed legislation at the state capitol building in Frankfort, Kentucky. Ordinarily, such actions would not be a problem. However, because the subject protests occurred during the school year, their actions left many districts with last-minute decisions regarding school closures. If a sufficient number of qualified substitutes could not be obtained, districts were forced to close their doors. And this left many parents and students scrambling to make alternate arrangements. As discussed more fully below, this action was not isolated. In Jefferson County, for example, the schools were forced to close for several days and critical student testing was delayed. The parties disagree regarding whether the teachers' actions constitute a work stoppage.

Following the forced school closures, the Kentucky Labor Cabinet issued subpoenas to ten school districts for the purpose of investigating and determining whether the absent

teachers committed violated KRS 336.130 through an illegal work stoppage. Thereafter, on April 16, 2019, the Kentucky Attorney General, siding with the protesting teachers, wrote to the Governor and Labor Cabinet Secretary, asserting that the subpoenas violated the teachers' First Amendment rights. Through this letter, the Attorney General requested that the Labor Cabinet voluntarily withdraw the subpoenas and called on the Governor to order withdrawal of the subpoenas, if necessary. David Dickerson, Secretary of the Labor Cabinet, denied the Attorney General's request. He explained that the subpoenas would not be withdrawn because the cabinet was simply investigating possible violations of Kentucky law as the cabinet is required to do.

Attorney General Andy Beshear and the Jefferson County Teachers Association then instituted this action in the Franklin Circuit Court. While the nature of the claims asserted in that court is contested, the plaintiff assert that Secretary Dickerson is exceeding his authority under various Kentucky statutes by issuing the subpoenas to obtain information regarding the teachers whose actions cause several districts to close.[1] The plaintiffs seek a temporary restraining order and/or a temporary injunction to prohibit Secretary Dickerson from acting on or enforcing the subpoenas.

The plaintiffs' motion will be denied because they have not shown a likelihood of success on the merits of their claims. Further, any injury the plaintiffs may suffer is minimal

---

[1] There is also a pending motion to remand to Franklin Circuit Court. The plaintiffs assert that they have not alleged any violations of federal law. The defendants argue that the plaintiffs have brought a free speech claim under the First Amendment of the United States Constitution based on attachments to the plaintiffs' Complaint. The plaintiffs acknowledge in their motion to remand that the Court may address the motion for injunctive relief prior to a ruling regarding the jurisdictional question. *See, e.g., Cont'l Cablevision of Michigan, Inc. v. Edward Rose Reality*, Inc., 840 F.2d 16 n. 7 (6th Cir. 1988).

because most of the information subject to the subpoenas has already been provided to the Labor Cabinet. Finally, denying the motion protects third parties from harm and promotes the public interest. In summary, the plaintiffs lose on all four factors which are considered by the Court in determining whether injunctive relief is warranted.

## I.

In 2018, the General Assembly passed a bill seeking to reform the state's ailing pension system. However, the bill was ultimately struck down by the Supreme Court of Kentucky because the General Assembly failed to follow certain required steps in passing the bill. The General Assembly reconvened for the 2019 Regular Session and introduced three bills affecting the public education system: House Bill 205 ("HB 205"), Senate Bill 250 ("SB 250"), and House Bill 525 ("HB 525"). HB 205 sought to provide dollar-for-dollar tax breaks as an incentive for individuals and organizations to donate to private school scholarship programs. SB 250 was introduced to amend an existing law to allow the superintendent of Jefferson County Public Schools to appoint a principal without the participation of a school-based decision-making council. HB 525 sought to reorganize the Board of Trustees of the Teachers' Retirement System to reduce the number of appointments made by the Kentucky Education Association to the board.

The Jefferson County Teachers Association apparently encouraged its members to oppose HB 205, SB 250, and HB 525, to join rallies against the bills at the Capitol, and to call and write their representatives and senators. School districts in Jefferson, Fayette, Madison, Marion, Bath, Carter, Boyd, and Letcher counties followed suit in that they closed schools on February 28, 2019, due to expected teacher absences caused by a "sick out." The Jefferson County School District also closed schools on March 6, 2019, and again on March 7, 2019,

due to the number of teachers and other school employees calling in sick. The Bullitt and Oldham County School Districts also closed on March 7, 2019, due to an excessive number of teachers calling in sick. The Jefferson County district again closed schools from March 12, 2019, to March 14, 2019, as a result of teachers calling in sick. The Bullitt County district also closed on March 13, 2019, and March 14, 2019, again due to a claimed "sick out." The Commissioner of Education of the Kentucky Department of Education explained that the number of sick leave requests for many of the districts was "abnormally high," and "numbered in the thousands." [Record No. 1-2, p. 33] Because of these "sick outs" children missed classes, parents were forced at the eleventh hour to find other means of child care, and ACT testing was affected in at least one district by the teachers' actions. These harms were neither insignificant nor trivial. They affected real people in real and substantial ways.

The Commissioner of Education e-mailed the superintendents of the ten school districts affected by the "sick outs" on March 14, 2019, for the purpose of requesting teacher attendance records during the "sick out" periods. [Record No. 1-2, pp. 29-30] Further, the Kentucky Labor Cabinet's Office of Inspector General ("OIG") issued administrative *subpoenas duces tecum* between April 10, 2019, and April 15, 2019, to the superintendents of the ten school districts. [Record No. 1-2, p. 38] The subpoenas directed the production, inspection, and copying of all documents identifying the names of any employees who called in sick during the sick out dates. Additionally, the subpoenas required the production of copies of all affidavits from employees or letters from licensed medical professionals provided by the employees who called in sick for any of the dates of the "sick outs."

On April 16, 2019, the Attorney General wrote to the Secretary Dickerson and Governor Bevin claiming that the administrative subpoenas issued to the school districts were illegal and violate the teachers' free speech rights. More specifically, he asserted that

> [t]eachers do not surrender their constitutional rights when they become public employees. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). They retain the rights secured by the First Amendment to the United States Constitution, and Sections 1 and 8 of the Kentucky Constitution, including their rights to speak freely, to peaceably assemble, and to petition the government for redress of grievances. *See* U.S. CONST. amend. 1; KY. CONST. §§ 1, 8.

[Record No. 1-2, pp. 40-42] This document was later incorporated into the plaintiffs' Complaint.

Unimpressed with the Attorney General's plea, Secretary Dickerson refused to rescind the subpoenas. He responded, in part, as follows:

> First, you speak of *duty* as a privilege that is unique to *your* office. Like you, I am the leader of an Executive Branch agency. Thus, I, too, have certain duties under Kentucky law. KRS 336.050(2) authorizes my office to "prosecute any violation of any of the provisions of any law which it is [my] duty to administer or enforce." This includes violations of KRS Chapter 336. In furtherance of this mandate, KRS 336.060(1) allows that "[i]n the conduct of an investigation or hearing [my office] or any authorized deputy may issue subpoenas to compel the attendance of witnesses and parties and the production of books, papers, and records competent and relevant to the matter under investigation." As the chief law enforcement officer of the Commonwealth, your primary *duty* should be in seeing that these laws are followed, not impeded.
>
> \*\*   \*\*   \*\*   \*\*
>
> There are also moral and ethical considerations in play. Many Kentuckians have expressed their frustration with the so-called "sick-outs" that the Labor Cabinet OIG is investigating. Working parents have had to scramble for expensive childcare on short notice, or potentially jeopardize their jobs . . . In Louisville, students have had to postpone taking the ACT—a requirement for admission to college—and parents have expressed concern that a significant investment they have made in ACT prep courses for their children have gone to waste. This is on top of the countless accommodations parents and students had to make in 2018 for similar actions by public-school employees during the debate over pension reform.

[Record No. 1-2, pp. 44-45]

The Labor Cabinet's OIG also served the Kentucky Department of Education ("KDE") with *subpoenas duces tecum* on May 2, 2019, requesting information similar to the information it had subpoenaed from the ten school districts. The parties agree that KDE has already complied by providing much of the information requested through the subpoenas. Full compliance, however, is uncertain at this time. And while several school districts have also complied with the cabinet's subpoenas, several others are due to produce records and information on May 10, 2019.

The plaintiffs filed suit in Franklin Circuit Court on April 29, 2019, alleging violations of the Kentucky Constitution and perhaps the First Amendment to the United States Constitution. Additionally, the plaintiffs request a declaratory judgment, finding that the Secretary of Labor exceeded his authority under Kentucky Revised Statute ("KRS") 336.130. [Record No. 1-2] The plaintiffs also claim that KRS 336.130(1) is vague and overbroad in violation of Kentucky Constitution. Further, they assert that the defendant violated KRS 336.130(2) and that 2017 House Bill 1[2] violates Section 51 of the Kentucky Constitution. [Record No. 1-2] Finally, the plaintiffs seek injunctive relief against the labor secretary to prevent him from enforcing the subpoenas or "in any way unconstitutionally reducing or eliminating the protections provided to teachers and public employees." [Record No. 1-2, p. 23]

The defendant removed this matter from the Franklin Circuit Court, asserting federal question jurisdiction. [Record No. 1] This Court conducted a hearing on May 7, 2019, on the

---

[2] 2017 House Bill 1 amended KRS 336.130 to indicate that public employees may not strike.

motion for injunctive relief originally filed in state court. Because all parties were provided notice of the hearing and an opportunity to present arguments regarding their respective positions, the court considers the matter as a request for the issuance of a preliminary injunction.

## II.

A preliminary injunction has been characterized as "one of the most drastic tools in the arsenal of judicial remedies." *Am. Civ. Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 444 (6th Cir. 2003). Preliminary injunctions are utilized to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas, et al. v. Camenisch*, 451 U.S. 390, 395 (1981). The plaintiffs bear the burden of establishing that a preliminary injunction is proper. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "A preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007). However, the proof needed is greater than the proof required to survive a summary judgment motion. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

The Court looks to the following factors in determining whether injunctive relief is appropriate in a given case:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (quoting *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995));

*see also Am. Civil Liberties Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015). The above factors are "balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary*, 228 F.3d at 736. Additionally, the factors do not need to be given equal weight. *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998).

<u>i. The plaintiffs have not shown a strong likelihood of success on the merits.</u>

Whether a plaintiff has demonstrated "a strong or substantial likelihood of success on the merits" is central to any request for injunctive relief. *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). This standard is more stringent than the standard applied by state courts in Kentucky. Under state law, the movant is only required to demonstrate the existence of a substantial question and a possibility of success. *Norsworthy v. Ky. Bd. of Med. Licensure*, 330 S.W.3d 58, 62 (Ky. 2009). In this Court, the probability of success on the merits that needs to be demonstrated is "inversely proportional to the degree of irreparable injury the plaintiff[s] will suffer absent an injunction." *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (referencing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

The plaintiffs assert that Secretary Dickerson exceeded his authority in issuing the subpoenas because the teachers were not engaged in a strike or a work stoppage, the law does not enable Dickerson to penalize public-school employees, and the issued subpoenas target constitutionally protected activity. As to the first claim, however, the Court concludes that the plaintiffs have not shown that Secretary Dickerson exceeded his authority in issuing the subpoenas.

KRS 336.050 and KRS 336.985(1) explicitly empower the secretary to prosecute violations of any of the provisions of the law which it is his duty to enforce and allows him to assess civil penalties imposed by KRS Chapter 336. The issuance of the subpoenas by Secretary Dickerson to determine whether a violation of KRS 336.130 occurred is likely within his statutory rights to prosecute violations under KRS Chapter 336. Further, as explained during the May 7 hearing, the defendant is merely investigating possible violations of KRS 336.130. The Labor Cabinet has not determined whether a violation of Kentucky law has occurred or whether the imposition of civil penalties is appropriate. Accordingly, the plaintiffs have not shown that Dickerson exceeded the scope of his authority by issuing subpoenas in accordance with his statutory grant of power.

As noted above, the plaintiffs also argue that Secretary Dickerson cannot enforce KRS 336.130 because Section 183 of the Kentucky Constitution, provides that "[t]he General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." They contend that the General Assembly has given explicit authority to the local school districts and the state education board, and not to the Labor Cabinet or the Labor Secretary to handle matters relating to the public-school system. But Kentucky statutes explicitly grant the Labor Cabinet the authority to prosecute and assess civil penalties against public employees, which includes public-school teachers who may have violated KRS Chapter 336. Secretary Dickerson was acting within his statutory grant of authority to investigate potential violations of KRS 336.130 and assess civil penalties if the Labor Cabinet concludes that a violation has occurred. Contrary to their claim, the plaintiffs have not demonstrated that Dickerson exceeded his statutory power to investigate potential violations of KRS 336.130.

Next, the plaintiffs have not shown that the "sick outs" do not constitute a strike or a work stoppage under Kentucky law. Instead, the opposite conclusion would seem to be more likely under the facts presented. KRS 336.130(1) states that "[e]mployees, collectively and individually, may strike, engage in peaceful picketing, and assembly collectively for peaceful purposes, *except that no public employee, collectively or individually, may engage in a strike or a work stoppage*." (emphasis added). The statute does not define a strike or a work stoppage, but Kentucky courts have concluded that "the word strike clearly includes a work stoppage and a job action which deprives the public of the services of the employees in question." *Abney v. City of Winchester*, 558 S.W.2d 622, 623 (Ky. Ct. App. 1977).

The plaintiffs argue that a work stoppage or strike always refers to a dispute with an employer over employment terms and conditions. [Record No. 1-3, p. 15] This argument, however, ignores the definition set forth in *Abney*. Here, it would appear from the information contained in the parties' pleadings that teachers collectively decided to call in "sick," leading to school closures on several occasions. This deprived parents, students, and taxpayers of the teacher's services. And because the "sickouts" likely constitute a strike or a work stoppage, the plaintiffs have failed to demonstrate a likelihood of success of showing that Secretary Dickerson acted outside the scope of his authority by issuing the subpoenas.

The plaintiffs have also failed to demonstrate that the subpoenas are infringing upon the teachers' exercise of their constitutional rights. To establish the likelihood of success on the merits, the plaintiffs "must show the likely existence of a constitutional violation causally related to the result sought to be enjoined." *Merck & Sharp & Dohme Corp. v. Conway*, 861 F. Supp. 2d 802 (E.D. Ky. 2012) (citing *L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 205 (6th Cir. 1985)). The Kentucky Court of Appeals explained in *Jefferson Cnty. Teachers Ass'n v.*

*Board of Ed. of Jefferson Cnty.* that teachers' constitutional rights are limited by countervailing rights of others and that the government can prohibit them from participating in work stoppages or strikes. 463 S.W.2d 627, 630 (Ky. 1970) (explaining that the rights of free speech and public assembly are limited by the countervailing rights of others and that constitutional rights do not license a violation of the law); *see also Bates v. Dause*, 502 F.2d 865, 866 (6th Cir. 1974) ("teachers in the public schools commit an illegal act when they participate in a strike"). The court in *Jefferson Cnty. Teachers Ass'n* affirmed the permanent injunction enjoining the teacher's organizations and individual teachers from participating in a concerted work stoppage or strike. 463 S.W.2d at 631. Here, the teachers were likely participating in a strike or work stoppage in violation of KRS 336.130, and the teachers' constitutional rights do not allow them to violate the law. Instead, these rights are limited by the rights of others. *See Jefferson Cnty. Teachers Ass'n,* 463 S.W.2d at 630. Because the teachers were likely engaging in a strike or a work stoppage, the plaintiffs cannot show a likelihood of success on the merits of the constitutional claims.

Where, as here, a plaintiff fails to demonstrate a likelihood of success on the merits, he or she must demonstrate a greater threat of irreparable injury. *Ohio ex rel. Celebrezze*, 812 F.2d at 290 (referencing *In re DeLorean Motor Co.*, 755 F.2d at 1229). However, as explained in the next section, the plaintiffs cannot show a substantial threat of irreparable injury. Instead, as the parties acknowledge, much of the information requested in the subpoenas has already been provided to the Labor Cabinet.

<u>ii. This case presents only a minimal threat of irreparable injury to teachers whose information will be provided to the Labor Cabinet.</u>

The plaintiffs must show that "irreparable injury is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 8 (2008). An injury is irreparable if it is not fully compensable by monetary damages. *Overstreet*, 305 F.3d at 578. Three factors are evaluated in determining the harm the plaintiffs may face: "(1) the substantiality of the injury alleged, (2) the likelihood of its occurrence, and (3) the adequacy of the proof provided." *Ohio ex rel. Celebrezze*, 812 F.2d at 290.

The injury alleged in the present case is not to the named plaintiffs, but to the teachers who participated in the "sick outs." Therefore, the plaintiffs must establish a connection between the teachers' alleged injuries and the Attorney General and/or the Jefferson County Teachers Association to give them standing to bring suit. The plaintiffs can show this connection because an organization or association may have standing solely based on its representation of its members[3] and the Attorney General is permitted to bring actions on behalf of the citizens of Kentucky. *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986); *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 173 (Ky. 2009).

The defendants correctly note that the "denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiffs' constitutional rights." *Overstreet*, 305 F.3d at 578; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). However, the plaintiffs have not demonstrated that they are likely to

---

[3] The Jefferson County Teachers Association alleges it is acting on behalf of its members.

succeed on the merits of their constitutional claims. Therefore, irreparable harm is not likely to occur.

Second and more importantly, the alleged injury to the plaintiffs is minimal at best because the majority of the subject information has already been provided to the Labor Cabinet by the KDE. In fact, the plaintiffs admit that, "[o]nce the Labor Cabinet receives the information requested in the subpoenas, the [alleged] harm will have occurred. . ." [Record No. 1-3, p. 31] The subpoenas issued to the school districts cannot now cause substantial irreparable harm because much of the information that would have been produced in accordance with the subpoenas has already been turned over to the Labor Cabinet using a method that the plaintiffs suggest in their motion.

### iii. A preliminary injunction will cause significant harm to third parties.

The analysis is not complete, however, because the Court also must "(1) balance the harm Plaintiff[s] would suffer if its request for a preliminary injunction were denied against the harm Defendant[] would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Merck*, 861 F. Supp. 2d at 817 (internal citations and quotations omitted).

The plaintiffs claim that significant harm will occur if a preliminary injunction is not issued because the teachers' constitutional rights will be immediately and irreparably impaired. However, they have not demonstrated a substantial likelihood of success on the merits for their constitutional claim. Further, the threat of irreparable injury is minimal because much of the information requested in the subpoenas has already been turned over to the Labor Cabinet. Conversely, issuing a preliminary injunction may substantially harm the defendant. The Labor Cabinet and its Secretary has an interest in investigating potential violations of KRS 336.130.

Further, if the cabinet is unable to properly investigate violations of KRS 336.130, the citizens of Kentucky will be harmed. Additionally, if the teachers participate in future "sick outs," and the Labor Cabinet is unable to investigate, other employees of the school systems, parents, students, and taxpayers will likely suffer harm as explained above. It bears repeating that this harm is not insubstantial as the plaintiffs would like to assert.

  iv. <u>The public interest will be served by not issuing injunctive relief.</u>

Finally, the Court considers "whether the public interest would be served by the issuance of the injunction." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). The plaintiffs argue that there is a strong public interest in protecting the constitutional rights of citizens. But as has previously been discussed, the plaintiffs have not demonstrated a substantial likelihood of success on the merits and there is only a slight chance of immediate and irreparable injury because the subject information has already been provided to the Labor Cabinet.

Further, the public has an interest in the Labor Cabinet's ability to investigate potential violations of KRS 336.130 by the individuals involved in the "sick outs." The citizens of Kentucky pay the salaries of the school employees involved in the "sick outs." Public education is not free. And if teachers violate the law, the Labor Cabinet should be able investigate. An injunction prohibiting the Labor Cabinet from doing its statutorily-authorized duty (i.e., investigating and prosecuting violations of the laws) jeopardizes the public perception of the government. Additionally, citizens of the Commonwealth have a strong and continuing interest in the public schools remaining open during the school year. Therefore, this factor also weighs in favor of rejecting the plaintiffs' request for injunctive relief.

**III.**

Some may think that the claims asserted in this action stand logic on its head—and they may be correct. Students are expected to attend classes. If they fail to do so without a valid excuse, their absence is duly-noted and appropriate action is taken. But the teachers at the center of this controversy expect different treatment. They assert through the Attorney General that the Secretary of the Labor Cabinet should look the other way when they avoid their employment obligations by improperly claiming to be sick.

Whether the plaintiffs will ultimately prevail on one or more of their claims by asserting violations of the First Amendment or other related rights on behalf of this group of educators is yet to be decided. It is clear, however, that at this point in the case, the plaintiffs are not entitled to injunctive relief to essentially halt the Labor Cabinet's investigation. Accordingly, it is hereby

**ORDERED** that the plaintiffs' motion for a temporary restraining order and temporary injunction [Record No. 1-3] is **DENIED.**

Dated: May 9, 2019.

Signed By: *Danny C. Reeves*
United States District Judge